******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATEWIDE GRIEVANCE COMMITTEE *v.* JOSEPH
P. GANIM
(SC 19192)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Vertefeuille, Js.

*Argued December 3, 2013—officially released April 15, 2014*

*Harold R. Rosnick*, with whom, on the brief, were *Bruce L. Levin* and *Barbara M. Schellenberg*, for the appellant (defendant).

*Patricia A. King*, chief disciplinary counsel, with whom was *Suzanne B. Sutton*, first assistant chief disciplinary counsel, for the appellee (plaintiff).

*Opinion*

ROGERS, C. J. This case addresses the limits of the deference that should be afforded to a local standing committee of the state bar when that committee recommends that an individual, who recently has been released from prison after serving a lengthy term for multiple federal felonies that he committed while holding public office, should be reinstated to the bar and, therefore, entrusted again with the privilege of practicing law. The defendant, Joseph P. Ganim, was suspended from the practice of law upon presentment by the plaintiff, the Statewide Grievance Committee, as a result of his conviction of sixteen federal felony offenses stemming from actions he took while he was the mayor of Bridgeport, the state's largest city.[1] Soon after his release from prison, he applied for reinstatement to the bar. Although a local standing committee that investigated the defendant's application recommended that he be reinstated, the trial court rejected that recommendation and denied the defendant's application. The defendant appeals[2] from the trial court's judgment, claiming that the court improperly failed to defer to the standing committee's recommendation that he be reinstated and, relatedly, that the court misinterpreted that committee's report, committed legal improprieties when reviewing the report, and wrongfully determined that some of the standing committee's findings were clearly erroneous. We disagree with these claims and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to the appeal. The defendant was admitted to the Connecticut bar in 1984. He served as mayor of the city of Bridgeport (city) from 1991 until 2003, when he was convicted, after a jury trial, of the federal offenses of racketeering in violation of 18 U.S.C. § 1962 (c), racketeering conspiracy in violation of 18 U.S.C. § 1962 (d), extortion in violation of 18 U.S.C. § 1951, honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, bribery involving programs receiving federal funds in violation of 18 U.S.C. § 666 (a) (1) (B), conspiracy to commit bribery in violation of 18 U.S.C. § 371, and filing false tax returns in violation of 26 U.S.C. § 7206 (1). *United States* v. *Ganim*, 510 F.3d 134, 136 (2d Cir. 2007), cert. denied, 552 U.S. 1313, 128 S. Ct. 1911, 170 L. Ed. 2d 749 (2008). The events underlying the defendant's convictions are summarized, as follows, in the opinion of the United States Court of Appeals for the Second Circuit upholding those convictions. "As mayor [of the city], [the defendant] was responsible for the overall operation of municipal government and, among other responsibilities, had final authority over the [c]ity's contracts. During his first campaign for mayor, [the defendant] became acquainted with Leonard J. Grimaldi (Grimaldi), who acted as a media advi-

sor, and Paul J. Pinto (Pinto), who began as his driver and aide. [The defendant] developed close relationships with Grimaldi and Pinto over the years that followed. Grimaldi subsequently formed a public relations company called Harbor Communications, of which he was the sole proprietor and employee. Pinto became associated with (and later purchased an ownership interest in) the Kasper Group, a Bridgeport architecture and engineering firm.

"A. [Professional Services Group] Contract Bid

"In 1995 and 1996, [the city] was considering privatizing its wastewater treatment facilities. [The defendant] suggested that Grimaldi contact Professional Services Group (PSG) to act as PSG's public relations consultant in connection with its bid for the water treatment contract. Grimaldi then contacted PSG, which retained him as a consultant for a fee of $30,000. PSG submitted a proposal for the contract, as did U.S. Water, a competing firm which was represented by Pinto and by United Properties. The owners of United Properties, Albert Lenoci, Sr. and Albert Lenoci, Jr. (the Lenocis), were [the defendant's] political benefactors.

"After the bids were submitted, [the defendant] told Pinto that he had decided to award the contract to PSG, but that Pinto should arrange a financial deal between PSG and United Properties because [the defendant] did not want to choose between big supporters. [The defendant] told Pinto that [i]f they want the deal, they'll do it. In turn, Pinto explained to Grimaldi that if PSG wanted to win the contract, it would have to take care of the Lenocis. Grimaldi acquiesced, as did PSG upon his advice. PSG agreed to pay Grimaldi $70,000 more per year for the contract's duration, which he was to pass on to Pinto and the Lenocis. Pinto informed [the defendant] of the deal, and [the defendant] approved the selection of PSG to operate the wastewater treatment facilities.

"Between May 1997 and April 1999, PSG paid Grimaldi roughly $311,396 in consulting fees, much but not all of which Grimaldi paid to Pinto. Grimaldi and Pinto used some portion of this money to provide [the defendant] benefits such as entertainment, meals and clothing.

"B. Fifty-Fifty Fee Sharing Agreement

"In December 1996, [the defendant] traveled with Pinto and Grimaldi to Tucson, Arizona. During the trip, [the defendant] told them they should join forces by agreeing to split any consulting fees they earned through future dealings with the [c]ity, and that [the defendant] would steer contracts to the pair, in return for which they would tak[e] care of his expenses and needs. Upon returning to [the city], the three men met to confirm the agreement. Grimaldi testified that during that meeting, he and Pinto agreed that . . . a portion

of that money [from the agreement] would be to take care of [the defendant]. If he needed cash, we would take care of him. If he needed suits, we'd take care of him. If he needed shirts, we'd take care of him. Any needs that he required, off of that 50/50 arrangement, we would take care of [the defendant]. In exchange for that, [the defendant] would make sure that all of our clients would get work from the city if they wanted it, that he would steer city contracts and jobs to our clients . . . .

"Pursuant to the fee sharing agreement, [the defendant] steered certain projects (some of which are discussed below) to Pinto's and Grimaldi's clients from February 1997 to April 1999. Meanwhile, Grimaldi and Pinto provided [the defendant] with cash, meals, fitness equipment, designer clothing, wine, jewelry and other items. Also at around that time, Grimaldi employed [the defendant's] wife. At [the defendant's] insistence, Grimaldi overpaid her, gave her payments in cash and did not report her income to the Internal Revenue Service.

"C. Bridgeport Energy-Funded Programs

"In 1998, [the defendant] had Grimaldi arrange for Bridgeport Energy—one of Grimaldi's clients—to contribute [$1 million] to fund a promotional advertising campaign and the [c]ity's Clean & Green program, which demolished and rehabilitated blighted properties. [The defendant] then arranged for Grimaldi to oversee the advertising campaign and for one of the Lenocis' firms, represented by Pinto, to administer the Clean & Green monies. Pursuant to the fee-sharing agreement, Grimaldi and Pinto used a portion of their consulting fees for these programs to benefit [the defendant].

"D. PSG Contract Extension & One-Third-Each Fee Sharing

"In late 1998, PSG sought a long-term extension of its contract to operate the [c]ity's wastewater treatment facilities. In a meeting with Grimaldi and Pinto, [the defendant] told Grimaldi that he would support the contract extension. In exchange, Grimaldi was to renegotiate his contract with PSG to get more of his consulting fees up front. [The defendant] also directed that the three men would split those fees—as well as fees from all future deals with the [c]ity—one-third each. Grimaldi was to pay [the defendant's] share to Pinto, who would hold the fees for [the defendant]. Following these discussions, Grimaldi successfully renegotiated his consulting fees with PSG, such that he was paid $495,000 in a front-loaded deal. On May 27, 1999, [the defendant] awarded PSG the contract extension. Over several weeks Grimaldi paid Pinto roughly two-thirds of the consulting fee, one third of which was for [the defendant]. Pinto kept [the defendant's] share mixed with his own money to avoid detection.

"Throughout most of 1999, Grimaldi and Pinto provided [the defendant]—upon his request—with money and benefits such as wine, cabinets, home improvements and meals. Pinto stated at trial that I was holding [the defendant's] money. When he needed the money, I'd give it to him or use it the way he directed me to . . . .

"In September 1999, [the defendant] and Grimaldi had a falling out, and eventually Grimaldi stopped paying [the defendant's] portion of the money to Pinto. From that point forward, [the defendant] shunned Grimaldi and prevented his clients from obtaining contracts with the [c]ity.

"E. Life Insurance Policy

"In early 1999, [the defendant] sought to use [c]ity funds to purchase a [$1 million] life insurance policy for himself, as well as for certain [c]ity department heads as cover. He approached Frank Sullivan (Sullivan), a childhood friend who had become a stockbroker, about brokering the deal. [The defendant] approved the purchase of the policies in April, 1999 without the [c]ity [c]ouncil's approval. After the purchase of the policies was leaked to the media, [the defendant] wrote to The Hartford Life Insurance Company to request that his own policy be terminated, but did not fill out the appropriate paperwork so that the policy would remain in effect. At the end of the fiscal year, [the defendant] had the funding for the policies inserted as one of many summary budget transfers, which were approved by the [c]ity [c]ouncil.

"Sullivan received a $17,500 commission for serving as the broker for [the defendant's] policy. Acting on behalf of [the defendant], Pinto advised Sullivan that if Sullivan wanted to do more business with the [c]ity, he would have to pay a kickback. Sullivan subsequently paid [$5000] in cash for [the defendant] and Pinto to share.

"F. Pension Plans

"In the fall of 1999, Sullivan sought to become the broker of record for two municipal pension plans, Plan A and Plan B. [The defendant] had Pinto tell Sullivan that if he wanted the position, Sullivan would have to give [50] percent of his commissions to [the defendant] and Pinto. With [the defendant's] support, Sullivan was appointed as the broker for the Plan B pension in September 1999. The following year, and again with [the defendant's] support, the [d]irector of [f]inance for the [c]ity . . . retained Sullivan's investment firm to assist the city in under-writing the Plan A pension. Sullivan received $38,000 as the first installment of his brokerage commission, which he intended to split with Pinto and [the defendant]. They did not request their respective cuts, however, as they had become anxious about the pending federal investigation against them.

"G. Juvenile Detention Facility

"In early 1999, the [c]ity, pursuant to a [s]tate of Connecticut project, was attempting to condemn property owned by B.C. Sand & Gravel in order to build a juvenile detention facility. B.C. Sand & Gravel retained Pinto, agreeing to pay him $100,000 if he successfully stopped the condemnation. Pinto informed [the defendant] of the agreement, who then exercised his influence to change the [c]ity's position on the condemnation. The [s]tate ultimately abandoned the project, and, as a result, Pinto received his fee from B.C. Sand & Gravel. Pinto held [one] half of that fee for [the defendant's] benefit pursuant to their usual fee sharing arrangement, and from that sum provided [the defendant] with cash and benefits upon his request.

"H. United Properties & Dollar-A-Square-Foot

"The Lenocis, principals of United Properties, were seeking in 1998 and 1999 to develop tracts of land in the [c]ity, including a site called Father Panik and another called Steel Point. The Lenocis and Pinto worked out a deal whereby United Properties would pay Pinto [$1] for each square foot of space they constructed in the [c]ity in the future. Pinto was to use some of that money to take care of [the defendant], who in turn lobbied to get the Lenocis a long-term lease to develop Father Panik. In 2000, the [c]ity sought bids to develop Steel Point. In a November 2000 meeting with Pinto and [the defendant], the Lenocis promised to raise $500,000 for [the defendant's] anticipated gubernatorial campaign in exchange for his commitment to get them the Steel Point project. But the Lenocis did not bid on the project when federal search warrants were executed at United Properties. Because neither the Father Panik nor the Steel Point projects materialized, [the defendant] and Pinto received no money in connection with these projects.

"I. False Income Tax Returns

"On his 1998 and 1999 income tax returns, [the defendant] failed to report as income $47,996 and $265,733, respectively, in cash and benefits provided by Pinto and Grimaldi, including the sums Grimaldi paid to [the defendant's] wife." (Internal quotation marks omitted.) Id., 137–40.

As a result of the foregoing conduct, the defendant was convicted as previously described and sentenced to a total effective sentence of nine years imprisonment, followed by three years of supervised release.[3] He further was ordered to pay a total of $148,617 in restitution, a fine of $150,000 and a special assessment of $1600.

Because of his federal convictions and upon presentment by the plaintiff, the trial court, *Arnold*, *J.*, suspended the defendant from the practice of law for a period of nine years, commencing on August 8, 2003.[4]

See Practice Book § 2-41. Pursuant to the trial court's order of suspension, the defendant, as of March 4, 2011, would have the right to seek permission from the court to apply for reinstatement to the bar, provided that he had satisfied certain minimum conditions.[5] In no event would the defendant's license to practice law be reinstated any earlier than August 8, 2011.

The defendant served approximately seven years of his prison sentence. He began his three year period of supervised release in July, 2010.[6] On May 19, 2011, the defendant filed a motion seeking permission to apply for reinstatement of his license to practice law.[7] The defendant represented that he had met, or exceeded, all of the conditions set by Judge Arnold as prerequisites for that application.[8] On May 24, 2011, the court granted the defendant's motion.

After publishing notice and conducting an investigation, the Standing Committee on Recommendations for Admission to the Bar for Fairfield County (standing committee) held a hearing on the defendant's application for reinstatement.[9] See Practice Book (2011) § 2-53.[10] Thereafter, the standing committee issued a report in which it concluded that the defendant was presently fit to practice law and, accordingly, recommended that he be reinstated.[11]

In its report, the standing committee summarized the opinions of eleven testifying witnesses that the defendant, with whom they were long acquainted,[12] was honorable and trustworthy and, therefore, fit to practice law. Those people included the defendant's wife and uncle, two church pastors, two local business owners and five area attorneys, one of whom was related to the defendant by marriage. The standing committee further noted the defendant's testimony that he "accept[ed] the verdict from his criminal case and accepts full responsibility for what occurred"; that he wanted his license reinstated because he believed he was once a good attorney, and could be again, and that he could continue to help people; that he accepted that he should be supervised, by his brother or another attorney, if reinstated; and that he was willing to do pro bono work as a condition of reinstatement. Moreover, the standing committee found that the defendant had satisfied the financial obligations imposed along with his convictions, either with his own funds or by borrowing from his family.

The standing committee mentioned the testimony of the defendant's supervising probation officer, who had stated that the defendant had been compliant and had done all he had been asked to do. Moreover, the probation officer "did not see anything that would say that [the defendant] is not fit to practice law." The standing committee further cited a March 6, 2012 order of the United States District Court in the defendant's criminal case denying early termination of his supervised

release; see footnote 6 of this opinion; wherein Judge Arterton had opined, inter alia, that the defendant's "community activities . . . serve the purpose of enhancing his [b]ar readmission chances and his public status rehabilitation."[13] The standing committee also noted that the defendant had not filed for bankruptcy, and that he had been working for his family's law firm and for two other attorneys as a paralegal.

In its report, the standing committee discussed one area of inquiry "that did cause [it] concern . . . ." At the hearing, the defendant had been questioned about a website created for a company he owned called "Federal Prison Consultant," and printouts from that website were admitted into evidence. The printouts reflected website statements such as "what happened to me should never happen to you or anyone," and "[i]n October of 2001, I was targeted and indicted by the [f]ederal [g]overnment on various white collar crimes," and that the website offers advice from someone who has "survived the onslaught." The website stated further that the defendant "became entangled in a [f]ederal prosecution."[14]

The standing committee observed that the defendant had explained the website statements, which suggested a belief that he had been prosecuted wrongfully, by testifying as follows: "And I don't know if I said it clearly before is, in my case, I mean I had a fair trial, I had good lawyers, I had a fair judge, and I live and stand by the result, I accept the verdict, I was found guilty. I accept that, I acknowledge that. I took an appeal, I lost. I took on in whatever way I thought I could and should, took responsibility and went and did my time and come out and understand there's still continuing consequences." Additionally, according to the defendant, a marketing person had constructed the website, and it had been reviewed by the plaintiff's counsel. Subsequent to being questioned on the website, the defendant arranged to have most of the previously quoted language removed.

In regard to a large volume of letters of recommendation that the defendant had submitted into evidence, the standing committee discounted the majority of them as nonprobative of the defendant's present fitness to practice law, because they "were from 2003 and 2005 and appear to [have been] drafted in connection with the criminal and sentencing proceedings against [the defendant]." Twenty-six of the letters, however, were from the fall of 2011 and, therefore, "did reflect on [the defendant's] present fitness to practice."[15] The standing committee also found the evidence submitted regarding the defendant's work activities while he was in prison to be "not . . . particularly probative . . . ." The standing committee noted finally that it had "received no evidence or testimony objecting to [the defendant's] application for reinstatement."

After finding that the defendant had satisfied the criteria set by Judge Arnold to apply for reinstatement, that the testimony of the witnesses at the hearing consistently supported a finding of present fitness, and that all of the evidence presented, with the exception of the Federal Prison Consultant website, "point[ed] to the fact that [the defendant] is presently fit to practice law," the standing committee recommended that the defendant be reinstated to the bar at the time his supervised release terminated, whenever that should occur.[16] It recommended further, consistent with Judge Arnold's order, that he be required to practice for one year under the supervision of another attorney, and, consistent with the defendant's own suggestion, that he be required to perform 1800 hours of pro bono service as a condition for reinstatement.

Thereafter, the standing committee's report was transferred to a three judge panel of the Superior Court to decide whether the defendant's application should be granted. See Practice Book (2011) § 2-53.[17] On September 27, 2012, the trial court rejected the recommendation of the standing committee and denied the defendant's application for reinstatement.

In its memorandum of decision, the trial court reviewed the detailed factual underpinnings of the defendant's criminal convictions, as previously recited, and noted that the standing committee, in its report, had made only brief reference to the crimes of which the defendant had been convicted and the sentence that he had received. The court then opined that the standing committee improperly had considered the conditions set by Judge Arnold as prerequisites for the defendant's right *to apply* for reinstatement to be the prerequisites for reinstatement itself. Additionally, the trial court held, the standing committee had failed to address the issue of the defendant's lack of remorse for his criminal misconduct and, on the record before it, improperly found that the defendant had admitted and accepted responsibility for that misconduct. According to the court, the defendant "was never asked by counsel or the [standing] committee whether he [had] committed the wrongful acts for which he was convicted nine years ago," and "[h]e was never asked for, nor did he offer, an apology or any explanation for the criminal misconduct that spanned five years." Moreover, the court stated, the defendant had offered no apologies or acknowledgment of wrongdoing at his earlier suspension hearings or at the hearing on his application for reinstatement. In the trial court's view, the defendant's remorse, and acknowledgment that he engaged in criminal misconduct, were "necessary components of rehabilitation and a finding of present fitness." Finally, the court discussed the fact that, following the defendant's criminal trial, he had received a sentence enhancement for what the sentencing judge found to be wilfully false testimony

on material matters. See footnote 3 of this opinion. In light of that circumstance, the court held that the standing committee's finding that all of the evidence, absent the Federal Prison Consulting website, pointed to the defendant's present fitness to practice law, was clearly erroneous.

The trial court also discussed the defendant's questionable use of a prison substance abuse program to achieve a sentence reduction;[18] the defendant's Federal Prison Consulting website, which the standing committee found did not point to a finding of present fitness; and the relatively short amount of time that had elapsed since the defendant's misconduct, given its serious nature, particularly since the defendant had spent all of that time either incarcerated or under supervised release. According to the court, "[i]t is hard to credit the passage of time as an indication of rehabilitation when it occurs under the watchful eyes of prison guards and a probation officer. A more appropriate barometer will involve an assessment of [the defendant's] conduct in the years following his discharge from his sentence."

In sum, the trial court "conclude[d] that the [standing] committee acted unreasonably and in an abuse of its discretion in finding that the [defendant] possessed the necessary traits of good moral character and fitness to practice law that the profession rightfully demands. The evidence contained in the record was clearly inadequate to rebut the reasonable inferences to be drawn from the extraordinarily serious misconduct spanning five years, occurring while [the defendant] was in a position of public trust.

"The egregious misconduct at issue was not an isolated error of judgment or a youthful indiscretion but a deliberate, repeated pattern of dishonesty and corruption. The crimes [the defendant] was convicted of directly implicate the core components of honesty, trustworthiness, and fair-dealing, which are fundamental to the legal profession." The court "recognize[d] that [the defendant] must not only be judged for his misconduct, but . . . also [must] be judged for his good conduct, and [that] the record does reflect his many good qualities. However, the underlying crimes spanning from 1995–1999, the uncontroverted evidence that he intentionally gave false testimony in 2003, the clear evidence in the record that he denied engaging in the criminal conduct and has never expressed remorse despite many opportunities to do so, the fact that he remains under the supervision of federal authorities and while on federal supervised release, established the [F]ederal [P]rison [C]onsulting website that the [standing] committee specifically found did not point to present fitness—compel[led] [the court's] conclusion that the record cannot substantiate a finding of good moral character and fitness to practice law." This appeal followed.

The defendant claims that the trial court improperly exceeded the scope of its review when, as to the question of his present fitness to practice law, it substituted its own opinion for that of the standing committee. He makes a number of subsidiary contentions in this regard, including that the court improperly considered as misconduct his false testimony at his criminal trial, misconstrued the standing committee's findings regarding the Federal Prison Consulting website, determined that insufficient time had passed since his misconduct to permit his reinstatement and set "a bright line requirement" that he had to show remorse and acknowledge his criminal wrongdoing to be reinstated.[19] The plaintiff disputes each of these contentions and claims generally that the trial court properly concluded that the defendant failed to present sufficient evidence, as was his burden, to establish that he was presently fit to practice law. We agree with the plaintiff.

We begin with general principles and standards of review. "Fixing the qualifications for, as well as admitting [or readmitting] persons to, the practice of law in this state has ever been an exercise of judicial power. . . . This power has been exercised with the assistance of committees of the bar appointed and acting under rules of court." (Citations omitted; internal quotation marks omitted.) *Scott* v. *State Bar Examining Committee*, 220 Conn. 812, 817, 601 A.2d 1021 (1992). "Although these committees have a broad power of discretion, they act under the court's supervision." Id. Accordingly, "[i]t is the court, and not the bar, or a committee, which takes the final and decisive action." (Internal quotation marks omitted.) Id.

In deciding whether to accept or reject a standing committee recommendation on reinstatement to the bar, the trial court does not take evidence or hear the matter de novo. Id., 817–18. Rather, it reviews the standing committee's "decision on [the] record to determine whether [the standing committee] has conducted a fair and impartial investigation," and whether it "acted fairly and reasonably or from prejudice and ill will in its consideration of the application." (Internal quotation marks omitted.) Id., 818. Ultimately, the court must decide whether the standing committee, by approving or withholding its approval of an application, "acted arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts." (Internal quotation marks omitted.) Id. In either admission or readmission proceedings, the burden is on an applicant to prove his or her present fitness to practice law.[20] *In re Application of Warren*, 149 Conn. 266, 274, 178 A.2d 528 (1962); *Statewide Grievance Committee* v. *Rapoport*, 119 Conn. App. 269, 275 n.3, 987 A.2d 1075, cert. denied, 297 Conn. 907, 995 A.2d 639 (2010). Accordingly, in the case of a positive recommendation on reinstatement by the standing committee, the trial court must

ensure that that burden has been satisfied. If the probative and credited evidence submitted by the applicant, on the whole, is not sufficient to establish present fitness, a recommendation of reinstatement necessarily is outside the reasonable range of outcomes to which a reviewing court should defer under the abuse of discretion standard.

As to any subordinate facts found by a standing committee, the trial court reviews them only for clear error. A factual determination "is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Considine* v. *Waterbury*, 279 Conn. 830, 858, 905 A.2d 70 (2006). The standing committee, as fact finder, "determines with finality the credibility of witnesses and the weight to be accorded their testimony." (Internal quotation marks omitted.) *Scott* v. *State Bar Examining Committee*, supra, 220 Conn. 822. At the same time, "[t]he ultimate facts [found by a standing committee] are reviewable by the court to determine whether they are reasonable and proper in view of the subordinate facts found and the applicable principles of law." (Internal quotation marks omitted.) Id., 824.

This court's review of the trial court's decision, to either accept or reject the standing committee's recommendation, is plenary. See id., 823 ("[b]ecause the trial court exercises no discretion, but rather is confined to a review of the record before the [standing committee], we are not limited to the deferential standard of 'manifest abuse' or 'injustice' when reviewing [the trial court's] legal conclusions about the adequacy of the evidence before the [standing committee]").

Attorney discipline exists "for the purpose of preserving the courts of justice from the official ministration of persons unfit to practise in them. . . . An attorney as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege which has been accorded him. His admission is upon the implied condition that his continued enjoyment of the right conferred is dependent upon his remaining a fit and safe person to exercise it, so that when he, by misconduct in any capacity, discloses that he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of his professional privilege may and ought to be declared forfeited. . . . Therefore, [i]f a court disciplines an attorney, it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important func-

tions of the legal profession." (Citations omitted; internal quotation marks omitted.) *Statewide Grievance Committee* v. *Spirer*, 247 Conn. 762, 771–72, 725 A.2d 948 (1999).

Consistent with the foregoing, the primary issue for determination on a reinstatement application is the applicant's present fitness to practice law. *In re Application of Pagano*, 207 Conn. 336, 345, 541 A.2d 104 (1988). "The court's fundamental inquiry in addressing a petition for reinstatement to the practice of law is whether the attorney has rehabilitated himself or herself in conduct and character since the suspension was imposed." 7 Am. Jur. 2d 177, Attorneys at Law § 115 (2007). The applicant must show that he is presently fit "to again exercise the privileges and functions of an attorney as an officer of the court and confidential manager of the affairs and business of others entrusted to his care . . . keeping . . . in view . . . his previous misconduct, his discipline therefor, and any reformation of character wrought thereby or otherwise as shown by his more recent life and conduct." *In re Kone*, 90 Conn. 440, 442, 97 A. 307 (1916).

To practice law, an individual must possess not only legal competence and professional capability, but also good moral character. See Practice Book §§ 2-5A and 2-8 (3); see also *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 51, 818 A.2d 14 (2003) ("[g]ood moral character is a necessary and proper qualification for admission to the bar" [internal quotation marks omitted]). Good moral character is comprised of, inter alia, "[t]he qualities of honesty, fairness, candor and trustworthiness"; Practice Book § 2-5A (a) (1); and "[r]espect for and obedience to the law . . . ." Practice Book § 2-5A (a) (3). We have long held these qualities to be vital. See *Doe* v. *Connecticut Bar Examining Committee*, supra, 52 ("[N]o moral character qualification for [b]ar membership is more important than truthfulness and candor. . . . It is not enough for an attorney that he be honest. He must be that, and more. He must be believed to be honest." [Internal quotation marks omitted.]); *In re Peck*, 88 Conn. 447, 450, 91 A. 274 (1914) ("[a]s important as it is that an attorney be competent to deal with the oftentimes intricate matters which may be entrusted to him, it is infinitely more so that he be upright and trustworthy"); see also *In re O'Brien's Petition*, 79 Conn. 46, 53, 63 A. 777 (1906) ("[i]t is absolutely essential to the usefulness of an attorney that he be entitled to the confidence of the community wherein he practices" [internal quotation marks omitted]), overruled on other grounds by *In re Application of Dinan*, 157 Conn. 67, 72, 244 A.2d 608 (1968). In Connecticut, "the ultimate burden of proving good character rests upon the applicant." (Internal quotation marks omitted.) *Doe* v. *Connecticut Bar Examining Committee*, supra, 51.

Our rules of practice do not enumerate specific criteria to be used in evaluating an application for reinstatement to the bar. Connecticut courts and those of other jurisdictions, however, have relied on several considerations, however, among them the following: "(1) the [applicant's] present moral fitness; (2) the [applicant's] acceptance of wrongdoing with sincerity and honesty; (3) the extent of the [applicant's] rehabilitation; (4) the nature and seriousness of the original misconduct; (5) the [applicant's] conduct following the discipline; (6) the time elapsed since the original discipline; (7) the [applicant's] character, maturity, and experience at the time of discipline and at present; (8) the [applicant's] current competency and qualifications to practice law; (9) [the applicant's payment of] restitution; and (10) the proof that the [applicant's] return to the practice of law will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive of the public interest." *In re Reinstatement of Wiederholt*, 24 P.3d 1219, 1224–25 (Alaska 2001); see also *In re Petition of Pier*, 561 N.W.2d 297, 300 n.3 (S.D. 1997) (citing cases from numerous jurisdictions); annot., 70 A.L.R.2d 283–93, §§ 11 through 18 (1960) (enumerating factors); 7 Am. Jur. 2d, supra, § 116, p. 178 (same).[21]

In regard to the seriousness of the original misconduct, a pattern of misconduct, rather than one isolated instance, warrants greater concern.[22] See, e.g., *Statewide Grievance Committee* v. *Schluger*, 230 Conn. 668, 680, 646 A.2d 781 (1994); see also Rules of Professional Conduct 8.4, commentary ("[a] pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation").[23] Consequently, "[t]he more serious the misconduct, the more time required to meet the burden of moral trustworthiness." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Rapoport*, supra, 119 Conn. App. 275. Moreover, "[t]he more egregious the misconduct resulting in disbarment [or suspension], the greater the proof of moral character and trustworthiness required for reinstatement." (Internal quotation marks omitted.) Id., 282.[24] Thus, when courts consider the evidence introduced in reinstatement proceedings of an applicant's current fitness, they must evaluate it against the backdrop of the applicant's prior misconduct, and "[inquire] whether the former is of sufficient weight to overcome the latter." *In re Reinstatement of Wiederholt*, supra, 24 P.3d 1227; see also id. ("[i]t makes little sense to consider a disbarred attorney's petition for reinstatement entirely in a vacuum, ignoring the conduct and attitude that led to disbarment").

An attorney's commission of misconduct that results in criminal convictions, particularly for crimes that involve elements of dishonesty,[25] casts a dark shadow

over his or her fitness to practice law, and typically results in a lengthy period of suspension or disbarment. See, e.g., *In re Richman*, 191 Ill. 2d 238, 241–42, 730 N.E.2d 45 (2000) (denying third petition for reinstatement, after eight years, of attorney disbarred for defrauding insurance companies, resulting in multiple federal convictions for mail and wire fraud); *In re Petition of Sowers*, 244 Kan. 594, 595, 771 P.2d 933 (1989) (denying third petition for reinstatement, after nine years, of attorney convicted of six federal felonies including conspiracy and fraud); *In re Reinstatement of Hird*, 184 P.3d 535, 539–40 (Okla. 2008) (denying second petition for reinstatement, after fourteen years, of attorney disbarred for acts which caused large monetary losses to victims and resulted in convictions for bank fraud and money laundering); see also General Statutes § 51-91a (c) (requiring that suspension of attorney for conviction of class B felony in Connecticut court must be for at least five years, and suspension for conviction of class A felony must be for at least seven years);[26] A.B.A., Compendium of Professional Responsibility: Rules and Standards (2011 Ed.) standard 5.11 (a) (Standards for Imposing Lawyer Sanctions) (recommending disbarment, most severe of available sanctions, as "generally appropriate when . . . a lawyer engages in serious criminal conduct," which is defined to include "intentional interference with the administration of justice . . . fraud . . . misappropriation, or theft . . . or an attempt or conspiracy or solicitation of another to commit any of these offenses").

Criminal misconduct committed by an attorney while he or she holds public office, in abuse of the public trust, is particularly egregious, and creates a daunting obstacle to proving rehabilitation and present fitness. See, e.g., *In re Gordon*, 385 Mass. 48, 50–51, 429 N.E.2d 1150 (1982) (denying second petition for reinstatement, after sixteen years of disbarment, of former judge convicted of larceny and conspiracy in highly publicized cases involving corruption related to public funds); *In re Reinstatement of Page*, 94 P.3d 80, 83 (Okla. 2004) (denying second petition for reinstatement, after twenty years, to former district attorney and judge convicted of racketeering and extortion for receiving bribes in exchange for influencing criminal proceedings); *In re Application of Gortmaker*, 308 Or. 482, 484, 782 P.2d 421 (1989) (denying reinstatement, after nine years, of former district attorney convicted on eight criminal counts, including theft, tampering and unsworn falsification, for actions taken in his official capacity); *In re Perrone*, 565 Pa. 563, 565, 570, 777 A.2d 413 (2001) (denying second petition for reinstatement, after eight years, of former public defender convicted of, inter alia, theft and tampering with public records, for defrauding city of funds intended for representation of indigent defendants); *Lawyer Disciplinary Board* v. *Moore*, 214 W. Va. 780, 783–84, 796, 591 S.E.2d 338 (2003) (denying

reinstatement, after twelve years of disbarment, of former governor convicted of multiple federal offenses for actions taken during election and while holding office); see also A.B.A. Standards for Imposing Lawyer Sanctions, supra, standard 5.21 (recommending disbarment as "generally appropriate when a lawyer in an official or governmental position knowingly misuses the position with the intent to obtain a significant benefit or advantage for himself or another").

This is because "[l]awyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of lawyers." Rules of Professional Conduct 8.4, commentary. "[M]isconduct by lawyers who are public officials is more egregious than that of other lawyers because of the betrayal of the public trust"; *Lawyer Disciplinary Board* v. *Moore*, supra, 214 W. Va. 792; which can result in the citizenry losing confidence in the institutions of government. When an attorney holding public office engages in misconduct and violates the public trust, he brings "disrepute not only on himself, but on all attorneys and further on all public officials." *In re Reinstatement of Anderson*, 51 P.3d 581, 585 (Okla. 2002).

After reviewing the record with the foregoing principles in mind, we hold that the trial court correctly determined that the standing committee acted unreasonably and, therefore, abused its discretion when it concluded that the defendant had met his burden of proving that he was presently morally fit to practice law and, therefore, that he should be reinstated to the bar. In short, given the extensive egregious misconduct that led to the defendant's suspension, the evidence he submitted to show that he had rehabilitated himself fell far short of what was necessary to prove his fitness with the requisite degree of confidence so that he again could be entrusted with the responsibilities of an attorney.

As the trial court observed, the standing committee directed very little of its investigation and report to an examination of the misconduct that led to the defendant's suspension.[27] That misconduct, however, warranted serious attention because, as we have explained, its severity necessarily informed the extent of the defendant's burden to show reformation. It was not an isolated instance of misjudgment, but rather, was extensive in scope, prolonged over a period of five years and marked by a consistent pattern of dishonesty, self-interest and violation of the public trust. The defendant's misconduct was not the unfortunate missteps of a young and inexperienced attorney, but instead, was the calculated behavior of a mature, sophisticated attorney who served as the mayor of the state's largest city. It resulted in his conviction of sixteen felony offenses in federal court and a lengthy prison sentence. As Judge Arterton found when applying multiple sentence

enhancements, the defendant was a "leader or organizer" of an illegal scheme, and his actions caused large losses to the government, in excess of $800,000. Moreover, in Judge Arterton's view, the defendant wilfully had given materially false testimony at his criminal trial,[28] which occurred in 2003, four years after the cessation of the misconduct for which he was convicted.[29] See footnote 3 of this opinion.

Unfortunately, the losses caused by the defendant's misconduct were not merely monetary ones. Because the defendant held a high public office and repeatedly abused that office by, inter alia, trading government contracts and influence for personal remuneration, the most serious damage he inflicted was to the public trust in government. When sentencing the defendant for his crimes, Judge Arterton described "the extraordinary harm done to the political system of the [c]ity . . . and beyond" as follows: "Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to think of politics as 'only for the insiders.' . . . Thus corruption has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels." (Citation omitted.) *United States* v. *Ganim*, United States District Court, Docket No. 3:01CR263 (JBA), 2006 WL 1210984, *5 (D. Conn. May 5, 2006). We agree with this assessment.

Properly viewed against the backdrop of the defendant's misconduct and the disrepute it brought upon himself, the legal profession and government itself, the evidence of reformation that the defendant presented to the standing committee, on which the standing committee expressly relied, fell well short of proving his present fitness to practice law.[30] The defendant's satisfaction of the basic prerequisites set by Judge Arnold to apply for readmission, his service of his criminal sentence, and his payment of his fines and restitution were not particularly weighty evidence of his present moral fitness, because they were compelled acts; therefore, they say little about the defendant's moral rehabilitation. See *In re Application of Gortmaker*, supra, 308 Or. 494 n.13 ("[a]pplicant had no choice in these matters—the law required him to do them"); see also A.B.A. Standards for Imposing Lawyer Sanctions, supra, standard 9.4 (a) (for purposes of attorney discipline, "forced or compelled restitution" is neither aggravating nor mitigating factor).

Moreover, the testimony and recent letters of reference from the defendant's character witnesses, although unquestionably positive and unanimously favorable, are not sufficient evidence of reformation to remove the taint of the defendant's prior misconduct.

"Declarations of good moral character do not necessarily refute the evidence of bad moral character reasonably inferable from the prior egregious misconduct." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Rapoport*, supra, 119 Conn. App. 282. Such testimonials, even when extensive and from persons in positions of high esteem, often are held inadequate to meet the high burden of proof required in cases of serious, repeated, criminal misconduct. See, e.g., *In re Reinstatement of Wiederholt*, supra, 24 P.3d 1230–31; *In re Reinstatement of Page*, supra, 94 P.3d 84. Given the degree of the defendant's misdeeds, the assurances of his supporters, some of whom were family members or close personal friends, cannot shoulder the heavy burden of establishing present fitness.

We further agree with the trial court that the defendant's failure to either explain, or acknowledge any responsibility for, his extensive criminal wrongdoing, or to express remorse for that wrongdoing, was a highly relevant consideration in the particular reinstatement proceeding in the present case.[31] Consequently, when the standing committee recommended reinstatement, without truly exploring or addressing that matter, it failed to undertake a fair investigation of the facts and, therefore, abused its discretion. Although we agree with the defendant that an applicant's refusal to admit guilt and express remorse for the events that led to his or her suspension is not a *per se* bar to reinstatement; see, e.g., *In re Hiss*, 368 Mass. 447, 455, 333 N.E.2d 429 (1975); *In re Reinstatement of Page*, supra, 94 P.3d 83–84; we disagree that it is wholly irrelevant; see *In re Reinstatement of Wiederholt*, supra, 24 P.3d 1227–28, 1228 n.41 (listing "numerous jurisdictions . . . [considering an applicant's] remorse and consciousness of prior wrongdoing to be persuasive factors in determining whether [he or she] currently has the level of moral and ethical character required for reinstatement"); particularly where the applicant stands convicted of multiple felony offenses.[32] See *Lawyer Disciplinary Board* v. *Moore*, supra, 214 W. Va. 794–96. Rather, the fact of the applicant's denial of responsibility, like the convictions themselves, "is simply another piece of evidence to consider, and to be given such weight as it deserves in light of the circumstances." Id., 795; see also *In re Reinstatement of Page*, supra, 83.

Here, in light of the extensiveness of the defendant's criminal misdeeds, of which he stood convicted after a jury trial and an unsuccessful appeal, the defendant's failure to acknowledge or explain his misconduct, or to recognize the severity thereof, was a circumstance that the standing committee needed to explore before recommending that the defendant could again be entrusted with the responsibility of practicing law. The defendant, on the one hand, did not affirmatively state his belief that he was innocent of the crimes of which he stood convicted, then attempt to reconcile that belief

with the evidence adduced against him in his criminal trial and the fact of his multiple convictions. On the other hand, he did not admit his transgressions, explain how they had occurred, express contrition therefor or assure the standing committee that he had changed and would not reoffend. In the face of receiving neither an acknowledgment of responsibility, nor some other plausible explanation, for the defendant's extensive record of proven criminal misconduct, and in light of the other factors weighing against him, the standing committee simply was not justified in concluding that that misconduct no longer disqualified the defendant from practicing law due to his moral unfitness. It bears repeating that the purpose of suspending an attorney from the practice of law is not to impose additional punishment, but to protect the courts and the public. *Statewide Grievance Committee* v. *Spirer*, supra, 247 Conn 771–72. In the absence of a full exploration of the defendant's attitude and beliefs regarding his convictions, the standing committee could not reliably ensure this protection.[33]

Finally, because the standing committee found that the defendant's Federal Prison Consultant website did not support a finding of present fitness, the trial court properly took that website into account when it rejected the standing committee's recommendation of reinstatement. Because the website, as late as 2011, contained language that reasonably can be read as suggesting that the defendant had been targeted and prosecuted unfairly, the standing committee's finding in this regard was not clearly erroneous.[34]

In sum, in view of the defendant's repeated criminal misconduct occurring over a five year period while he held public office, which resulted in his conviction of sixteen federal felony offenses and a lengthy prison sentence, the evidence that the defendant presented of his rehabilitation was not sufficient to establish his present moral fitness, and the uncontroverted evidence of the defendant's false testimony in 2003 and his questionable website statements, on display as late as 2011, weighed further against him. Evidence that he had fulfilled the obligations attendant to his criminal sentence and met the prerequisites to apply for reinstatement, was employed and not bankrupt, and had garnered the support of certain members of his community, fell short of meeting the high burden resulting from his misconduct. We acknowledge that a criminal conviction is not an absolute bar to regaining a license to practice law and that, in Connecticut, no statute or court rule directly answers the question of what period of time constitutes an adequate period of rehabilitation for an individual with a record of misconduct comparable to the defendant's. We are confident, however, that in the present case, the defendant has not demonstrated a period of exemplary behavior persisting for a sufficient period of time to offset his transgressions and, accordingly, to

provide the necessary assurance that he may once again be entrusted with the practice of law.[35] Consequently, we hold that the trial court properly concluded that the standing committee abused its discretion when it determined that the defendant was presently fit to practice law and recommended his reinstatement.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant was indicted on twenty-four counts and convicted of sixteen of those counts.

[2] The defendant appealed to the Appellate Court, and we transferred his appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Pursuant to the United States Sentencing Guidelines, the sentencing court applied multiple sentence enhancements due to the amount of losses sustained by the government resulting from the defendant's criminal activity, which exceeded $800,000, the defendant's role as a leader or organizer of an illegal scheme and the defendant's obstruction of justice, specifically, his materially false testimony at trial. See *United States* v. *Ganim*, United States District Court, Docket No. 3:01CR263 (JBA), 2006 WL 1210984, *1 (D. Conn. 2006), aff'd, 510 F.3d 134, 136 (2d Cir. 2007), cert. denied, 552 U.S. 1313, 128 S. Ct. 1911, 170 L. Ed. 2d 749 (2008). The defendant's sentence was at the top end of the resulting guidelines range, given the court's finding "that the defendant's conduct was part of a systematic or pervasive corruption of a governmental . . . office that may cause loss of public confidence in government . . . ." (Internal quotation marks omitted.) Id.

[4] Soon after the defendant's convictions, the trial court, *Dewey, J.*, ordered an interim suspension of the defendant's license to practice law. Judge Arnold's suspension order was issued on March 4, 2010, near the conclusion of the defendant's term of imprisonment, and by its terms applied retroactively to August 8, 2003. Because the order was based on a stipulated agreement between the defendant's counsel and counsel for the plaintiff, no evidentiary hearing was held.

[5] Those conditions included requirements that the defendant: complete a minimum of twelve hours of continuing legal education, at least six of which were in the area of professional responsibility; make payment of all restitution and fines imposed as a result of his convictions; complete a minimum of 100 hours of community service; and comply with all conditions of his supervised release. Moreover, in the event the defendant were to be reinstated, he would be required to practice under the supervision of a mentoring attorney for one year.

[6] Approximately one year later, on September 1, 2011, the defendant requested early termination of his supervised release, which the federal government opposed. See 18 U.S.C. § 3583 (e) (1). On March 6, 2012, the United States District Court, Arterton, J., denied the defendant's request.

[7] Two months earlier, on March 14, 2011, the defendant had filed with the court an application for reinstatement to the bar, which was referred to the Standing Committee on Recommendations for Admission to the Bar for Fairfield County for investigation. Thereafter, on May 19, 2011, consistent with Judge Arnold's earlier order of suspension, the defendant filed a motion seeking permission to reapply for reinstatement.

[8] In his March 14, 2011 motion for reinstatement; see footnote 7 of this opinion; the defendant stated that he had completed thirty-five hours of continuing education and more than 150 hours of community service.

[9] Notice was published in the Connecticut Law Journal on May 10, 2011. The hearing was held on four separate days, concluding on March 5, 2012.

[10] Practice Book (2011) § 2-53 (a) provides in relevant part that a suspended attorney's application for reinstatement "shall be referred, by the court to which it is brought, to the standing committee on recommendations for admission to the bar that has jurisdiction over the judicial district court location in which the applicant was suspended . . . and notice of the pendency of such application shall be given to the state's attorney of that judicial district, the chair of the grievance panel whose jurisdiction includes that judicial district court location, the statewide grievance committee, the attorney or attorneys appointed by the court pursuant to [Practice Book §] 2-64, and to all complainants whose complaints against the attorney resulted in the discipline for which the attorney was . . . suspended . . . and it

shall also be published in the Connecticut Law Journal."

This subsection was amended and redesignated, in part, as subsection (f) in 2013. The redesignated provision now provides: "The application [for reinstatement] shall be referred by the clerk of the superior court where it is filed to the chief justice or designee, who shall refer the matter to a standing committee on recommendations for admission to the bar whose members do not maintain their primary office in the same judicial district as the applicant." Practice Book § 2-53 (f).

[11] Practice Book (2011) § 2-53 (b) provides: "The standing committee on recommendations shall investigate the application, hold hearings pertaining thereto and render a report with its recommendations to the court. It shall take all testimony at its hearings under oath and shall include in its report subordinate findings of facts and conclusions as well as its recommendation. The standing committee shall have a record made of its proceedings which shall include a copy of the application for reinstatement or readmission, a transcript of its hearings thereon, any exhibits received by the committee, any other documents considered by the committee in making its recommendations, and copies of all notices provided by the committee in accordance with this section."

[12] With the exception of one individual, the persons who testified at the hearing all had been acquainted with the defendant for at least one decade and in most cases for more than twenty years.

[13] During the proceedings before the standing committee, the defendant had argued, on the basis of his probation officer's testimony regarding off-the-record discussions with Judge Arterton, that that judge supported his application for reinstatement. In her March 6, 2012 order, however, Judge Arterton wrote that "[t]he [c]ourt has taken no position on [the defendant's] application for bar readmission."

[14] The standing committee's selective quotation from the website is based on a partially illegible printout of the website that was admitted into evidence. Later in the hearing, however, a standing committee member accessed the website and retrieved the full language of the portion at issue. It is reflected in the hearing transcript as follows: "[W]hat happened to me should never happen to you or anyone, but it does and it's happened to you. I hope I can help. Regardless of how it happened or why the federal government has targeted you for criminal prosecution, you absolutely cannot try to prepare yourself and your family with what lies ahead without expert help from someone who has been there and who has survived the onslaught. . . .

"I'm sure our stories are very similar. We both led successful and prosperous lives and then for whatever reason we became entangled in a federal prosecution. Rightly or wrongly we became what is literally referred to as the target of a federal investigation. Once that happened the whole world began to change. Lawyers, perhaps other experts in federal law were hired, but in the end all the roads seemed to lead to the same stark and perhaps unthinkable reality, prison."

[15] Those letters were written by area attorneys and other personal acquaintances of the defendant.

[16] At the time of the standing committee's recommendation, the defendant's supervised release was scheduled to terminate in July, 2013.

[17] Practice Book (2011) § 2-53 (c) provides that, upon receipt of the standing committee's report and record of the standing committee proceedings, "[t]he court shall thereupon inform the chief justice of the supreme court of the pending application and report, and the chief justice shall designate two other judges of the superior court to sit with the judge presiding at the session. Such three judges, or a majority of them, shall determine whether the application should be granted."

[18] In her order denying the defendant's request for early termination of supervised release, which was submitted to the trial court by stipulation of the parties, United States District Court Judge Arterton stated the following: "[The] [d]efendant was released by the Federal Bureau of Prisons . . . one year early because he successfully completed the [Bureau of Prison's] Residential Drug Abuse Treatment Program [drug program]. The existence of any substance abuse problem remains a puzzlement since [the defendant] made no claim of a substance abuse problem at sentencing, and as a result the [c]ourt waived the mandatory drug testing condition of supervised release. Based on the [g]overnment's notification that [the defendant] had been admitted to this drug program, the [United States] Probation Officer petitioned for modification of [the] [d]efendant's conditions of supervised release to add a requirement of participation in an approved substance abuse treatment program. By report dated October 31, 2011 from the Connecticut

Renaissance program, however, [the defendant] was deemed not to need treatment based on its intake criteria and [the defendant's] self-report."

At the hearing before the standing committee, the defendant explained his use of the drug program, claiming that he had been drinking and taking antianxiety medication to handle stress around the time of his prosecution, but acknowledging that the potential for a sentence reduction also attracted him to the drug program. The trial court recognized that the standing committee apparently "accept[ed]" this testimony, as was its prerogative, and concluded that it would "not substitute its views on the issue for those of the standing committee other than to join in Judge Arterton's 'puzzlement' regarding [the defendant's] use of the [drug] program."

[19] The defendant also claims that the trial court improperly concluded that the standing committee had confused the conditions set by Judge Arnold for the defendant's right to *apply* for readmission to the bar; see footnote 5 of this opinion; with those necessary for him to *gain* readmission to the bar. According to the defendant, the court read one statement in the standing committee report, which inaccurately suggested that the issue before it was whether the defendant had met the conditions to apply for readmission, out of context, and it is clear from the standing committee's report overall that it understood that there were distinct criteria for readmission. We agree that the standing committee's decision, read in full, reflects that that body properly understood the issue it was charged with determining. We observe, nevertheless, that the court's concern of confusion, as articulated in its decision, is based on *two* misstatements of that issue in the standing committee's report, as well as one in the defendant's brief to the standing committee and one in a question posed by a standing committee member to counsel at the hearing before the standing committee. Moreover, it appears that the defendant, when initiating these proceedings, was himself confused about the protocol for reinstatement. See footnote 7 of this opinion. In any event, reading *the trial court's* decision as a whole, we conclude that the court properly reviewed the entire substance of the standing committee's report and that the stated concern played only a negligible part in the trial court's ultimate determination.

[20] This burden of proof has been codified in our rules of practice. See Practice Book §§ 2-8 (3) and 2-53 (j). Recently the rules were amended to provide that an applicant for reinstatement must "demonstrate by clear and convincing evidence" that he or she has met this burden. Practice Book § 2-53 (j). We need not decide whether this provision applies retroactively to govern the defendant's application because we conclude, for the reasons hereinafter provided, that the defendant failed to prove present fitness even under the less vigorous standard of preponderance of the evidence.

[21] These factors correspond, in part, to the aggravating and mitigating factors listed in the American Bar Association's Standards for Imposing Lawyer Sanctions. See A.B.A., Compendium of Professional Responsibility: Rules and Standards (2011 Ed.) standards 9.2 and 9.3; see also id., standard 9.22 (defining aggravating factors to include "[c] a pattern of misconduct . . . [d] multiple offenses . . . [g] refusal to acknowledge [the] wrongful nature of conduct . . . [i] substantial experience in the practice of law . . . [j] indifference to making restitution . . . [and] [k] illegal misconduct"); id., standard 9.32 (defining mitigating factors to include "[d] timely good faith effort to make restitution or to rectify consequences of misconduct . . . [f] inexperience in the practice of law . . . [*l*] remorse . . . [and] [m] remoteness of prior offenses"). In evaluating attorney misconduct and determining appropriate discipline, Connecticut courts have been guided by the American Bar Association's standards. See *Statewide Grievance Committee* v. *Spirer*, supra, 247 Conn. 782.

[22] It is clear that misconduct resulting in suspension may include conduct unrelated to an attorney's practice of law. See *Statewide Grievance Committee* v. *Schluger*, 230 Conn. 668, 681 n.17, 646 A.2d 781 (1994) ("[P]rofessional honesty and honor are not to be expected as the accompaniment of dishonesty and dishonor in other relations. So it is that we, in common with other courts, hold . . . that misconduct, indicative of moral unfitness for the profession, whether it be professional or nonprofessional, justifies dismissal as well as exclusion from the bar." [Internal quotation marks omitted.]); see also *Grievance Committee* v. *Broder*, 112 Conn. 269, 274, 152 A. 292 (1930).

[23] The Rules of Professional Conduct define the rights and obligations of attorneys practicing within Connecticut. *Statewide Grievance Committee* v. *Schluger*, supra, 230 Conn. 674.

[24] "Because a petitioner for reinstatement must demonstrate moral fitness and good character sufficient to be trusted again, the petitioner must make a

showing of these characteristics that overcome[s] the court's former adverse judgment on the petitioner's character. Accordingly, [courts of our sister states] have stated that petitioners for reinstatement should be held to an even higher standard of conduct than first-time applicants because they have already demonstrated that they are at risk for unethical conduct. The majority position among courts is that the more culpable the conduct, the greater the burden for proving one is entitled to reinstatement." (Footnotes omitted; internal quotation marks omitted.) *In re Reinstatement of Wiederholt*, supra, 24 P.3d 1224; see also *Lawyer Disciplinary Board* v. *Moore*, 214 W. Va. 780, 788, 591 S.E.2d 338 (2003) ("A person seeking reinstatement has the burden of overcoming a prior adjudication of disqualification. The judgment of disbarment continues to be evidence against the applicant and he may overcome it only by most persuasive proof." [Internal quotation marks omitted.]).

[25] The Rules of Professional Conduct describe professional misconduct, in part, as an attorney's "[commission of] a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects"; Rules of Professional Conduct 8.4 (2); or "[engaging] in conduct involving dishonesty, fraud, deceit or misrepresentation . . . ." Rules of Professional Conduct 8.4 (3).

[26] There is no statutory counterpart to § 51-91a that addresses federal felony convictions, and we have declined to extend the scope of that provision beyond its terms to apply to such convictions. See *Statewide Grievance Committee* v. *Spirer*, supra, 247 Conn. 777. Rather, in the case of a federal felony conviction, a court has discretion to either disbar or suspend the attorney for whatever period it deems appropriate. See id., 780; see also Practice Book § 2-41 (e).

[27] Compare, e.g., *Statewide Grievance Committee* v. *Spirer*, supra, 247 Conn. 784 (where memorandum of decision included lengthy discussion of attorney's involvement in illicit transactions, there was "no basis upon which to conclude that the court did not factor into its deliberations the nature of the defendant's offenses").

[28] In applying a two level sentence enhancement for obstruction of justice, Judge Arterton stated the following: "I find by clear and convincing evidence that [the defendant's] trial testimony was so fundamentally and materially in dispute to that which was given by others whose testimony was corroborated, that I find that the subject of his denials of any fee splitting deals; his explanation of where thousands of dollars of cash came from; his explanation that he, not others, paid for many of the items in evidence; his testimony that his attorney brother's forbearance of a fee on Pinto's personal injury claim constituted reimbursement to Pinto for the home building and furnishing expenses; his denial of having claimed . . . that he had a legal opinion that authorized him to by-pass the city council to obtain the life insurance, are examples of material matters on which he gave false testimony with willful intent, it was not by confusion, mistake or faulty memory." According to the court, the defendant's testimony constituted "a flat out and false denial," and not mistake, confusion or misunderstanding, "on material matters intended to influence the jury with respect to whether or not he had a guilty role, a criminal role in the schemes [at issue]. It sounded like, if ever I heard one, a spin to avoid conviction, and it failed when the jury disbelieved him, credited those with opposite testimony, and convicted him on [sixteen] counts."

[29] The defendant argues that the trial court improperly made a factual finding that his testimony at his criminal trial was false and then treated it as misconduct, and that the standing committee, which is the body charged with fact finding in reinstatement proceedings, did not make such a finding. According to the defendant, even if there was evidence in the record that he had testified falsely, the standing committee was not obligated to credit it and the court was prohibited from doing so. Moreover, the defendant contends, if the trial court gave the sentencing judge's findings as to the falsity of his testimony preclusive effect in the reinstatement proceedings, it did so improperly because the requirements of the doctrine of collateral estoppel were unmet.

We disagree with the defendant's characterization of the trial court's analysis. The court did not "find" that the defendant had given false testimony, nor did it give the sentencing judge's findings preclusive effect. Rather, the court properly observed that there was uncontroverted evidence in the record—namely, the sentencing transcript from the defendant's criminal trial—that the sentencing judge found him to have testified falsely. See footnote 28 of this opinion. According to the court, therefore, the standing

committee's finding in its report, that "[a]ll" of the evidence in the record, aside from the defendant's website, pointed to his present fitness, was clearly erroneous.

We agree with the trial court that the standing committee's finding regarding the substance of the evidence is not supported by the record, and that the standing committee's failure to acknowledge or address the sentencing transcript was an abuse of its discretion. When a bar applicant has a criminal history, the views of the judge(s) who oversaw his or her criminal trial(s), particularly in regard to the applicant's lack of veracity, are relevant evidence of unfitness that should not be ignored. See, e.g., *In re Application of Koenig*, 152 Conn. 125, 129, 204 A.2d 33 (1964); *In re Application of Gortmaker*, supra, 308 Or. 488–89.

[30] We agree with the standing committee that certain other evidence, such as the defendant's work activities while imprisoned, and letters of support that were drafted in 2003–2005 in conjunction with his criminal trial, were not probative of the issue of the defendant's fitness to practice law in 2011.

[31] In regard to the standing committee's statement, in its report, that the defendant had "testified that he accepts the verdict from his criminal case *and accepts full responsibility for what occurred*"; (emphasis added); the trial court, after reviewing the page of the hearing transcript cited in support of that statement, disagreed. We agree with the trial court that the standing committee's characterization of the cited testimony is inapt, and that the defendant never actually acknowledged responsibility for his criminal misconduct, as opposed to acknowledging that a jury had found that he had engaged in that misconduct. Acceptance of the fact of a guilty verdict, after a jury trial, is distinct from acceptance of responsibility for one's own actions, and it is clear from the broader context of the defendant's testimony that he was speaking of the former.

[32] The defendant contends that the trial court improperly held, as a matter of law, that he *necessarily* had to be found remorseful, or acknowledge his criminal wrongdoing, before he could be found presently fit to practice law. According to the defendant, the court considered remorse and acknowledgment of wrongdoing to be "a bright line requirement for readmission," and such a requirement "is not prescribed by statute or court rule . . . ." We recognize that the trial court did devote a significant portion of its analysis to the issue of the defendant's lack of remorse, and it ended that section of its memorandum of decision by concluding that the standing committee improperly "found that [the defendant] was remorseful or acknowledged that he engaged in the criminal misconduct, *which are necessary components of rehabilitation and a finding of present fitness*." (Emphasis added.) At the same time, however, as we noted previously in this opinion, it is clear that lack of remorse was not the sole basis for the court's ultimate determination that the defendant had not met his burden of proving present fitness.

To the extent the trial court's decision can be read as stating a hard and fast rule requiring remorse, in all cases, as an absolute condition for reinstatement, we disavow it as legally incorrect. Nevertheless, as we explain more fully hereinafter, the defendant's lack of remorse, particularly as it was not accompanied by an explicit profession of innocence and plausible explanation for his sixteen criminal convictions, certainly was a proper consideration in this case, even if it was not a dispositive one. Additionally, even putting aside the issue of the defendant's remorse, or lack thereof, we still would conclude that the other probative and credited evidence in the record was not sufficient to support the standing committee's finding of present fitness. Accordingly, any error by the trial court in this regard was of no consequence.

[33] In a reinstatement proceeding, an applicant's previous criminal convictions, upheld on appeal, are treated as conclusive evidence that the applicant in fact engaged in conduct that was seriously wrong. *Lawyer Disciplinary Board* v. *Moore*, supra, 214 W. Va. 795. Unless this premise somehow is shown to be faulty, an applicant's subjective belief that he did not in fact engage in wrongful conduct suggests two other possibilities. "The first possibility is that the [applicant] is, for whatever reason, in such a state of denial as to be unable to appreciate the difference between reality and imagination with respect to what he did and did not do. If this is the case, a necessary premise for rehabilitation (and for the ability to practice law)—the ability to appreciate the reality of what one is doing and has done—is missing from the [applicant].

"The second possibility is that the [applicant's] ability to form reasonably acceptable moral and legal conclusions about his conduct—and his ability to appreciate and apply the commonly-agreed upon meaning of the law and

the ethical requirements of the legal profession—are so far from adequate that he similarly has no business practicing law." Id., 795–96. These were possibilities that the standing committee should have explored in the present case.

[34] We disagree with the defendant's contention that in fact, the standing committee found the website to be "neutral" evidence, simply because the standing committee report included a recitation of the defendant's testimony explaining the website statements. In its concluding portion, the standing committee report states clearly that "[a]ll of the evidence presented . . . *other than . . . the Federal Prison Consultant website*, point[s] to the fact that [the defendant] is presently fit to practice law." (Emphasis added.) Additionally, the report provides that the line of questioning concerning the website "cause[d] concern for the [standing] [c]ommittee." Fairly read, these statements indicate that the standing committee considered the website to be evidence unfavorable to the defendant.

[35] Although we agree with the defendant that a person's good behavior while he or she is incarcerated or on supervised release is not entirely incompetent evidence of his or her rehabilitation, we also concur with the trial court that a person's ability to maintain the straight and narrow outside the confines of a structured and supervised life lends much stronger support to a finding of moral fitness. We reiterate that the defendant applied for reinstatement less than one year after serving his prison term, while he remained on supervised release. Although the rules of practice in effect at the time permitted his application, they since have been amended to provide that an application for reinstatement shall not be filed until, inter alia, "[t]he applicant has successfully completed any criminal sentence *including*, but not limited to, *a sentence of* incarceration, probation, parole, *supervised release*, or period of sex offender registration and has fully complied with any orders regarding conditions, restitution, criminal penalties or fines . . . ." (Emphasis added.) Practice Book § 2-53 (d) (4).